COURT OF APPEALS.  Albany, March, 1855.  Before *Gardiner*, Chief Judge, and *Denio*, *Johnson*, *Ruggles*, *Dean*, *Hand*, *Crippen* and *Marvin*, Judges.

THE PEOPLE, plaintiffs in error, *v.* JOHN W. THOMS, defendant in error.

On the trial of a person charged with having in his possession an altered and forged bank-bill, with intent to pass the same as true, it is not competent for the prosecution to prove that, on searching the prisoner's wife, immediately after his arrest, there were found in her pockets parts of bank-bills, apparently cut for the purpose of making similar alterations, there being no evidence of any concert between the prisoner and his wife, or that they were mutually engaged in altering bank-bills, or that either of them had any knowledge of the facts proved against the other; and where such evidence had been received, and the prisoner was convicted, the judgment was reversed.

Where, on the arrest of a prisoner, he made confessions to the officer, admitting his guilt, the officer having made no promises and no threats, such confessions were held competent evidence, although it appeared that the prisoner was very much frightened, and seemed much terrified at the time they were made, and although the statements of the prisoner were made partly in English and partly in German, and the witness called to prove the confessions did not understand what was said in German. By *Dean*, J.

Form of a writ of error, sued out in behalf of the people, to remove a criminal case from the Supreme Court to the Court of Appeals.

Form of an indictment for having in possession an altered and forged bank-bill, with intent to pass the same, the bill purporting to have been issued by a bank in another state.

THIS cause came before the court on a writ of error, sued out in behalf of the people, in the following form:

The People of the State of New-York, to the Justices of [L. S.] the Supreme Court for the First Judicial District, Greeting:

Because in the record and proceedings, and also in the giving of judgment upon a certain writ of error in your court, before you, brought from the Court of the General Sessions of the Peace in and for the city and county of New-York, between the said people and John W. Thoms, in a

The People *v.* Thoms.

plea that the said John W. Thoms had committed the crime of forgery, whereupon a new trial hath been ordered by your said court upon the conviction of the said John W. Thoms, manifest error hath intervened, as is said, to the great damage of the said people, as complained, and we being willing that the error, if any, should be corrected, and full and speedy justice done in the premises in this behalf, do command you, that if judgment be thereupon given, then, and without delay, you distinctly and openly send, under your seal, the record and proceedings aforesaid, with all things touching or in any wise concerning the same, to our judges of the Court of Appeals, within twenty days after serving of this writ, together with this writ, that the record and proceedings aforesaid being inspected by our said judges, they may cause to be done thereupon, for correcting that error, what of right ought to be done.

Witness, Addison Gardiner, one of the judges of the Court of Appeals of the State of New-York, at the city of Albany, this twenty-fourth day of January, in the year one thousand eight hundred and fifty-four.

B. F. HARWOOD,

N. BOWDITCH BLUNT,         *Clerk Court of Appeals.*
      *District Attorney.*

It appeared by the return that the prisoner had been indicted for forgery. The indictment was in the following form:

*City and County of New-York, ss:*

The jurors of the people of the State of New-York, in and for the body of the city and county of New-York, upon their oath, present: That John W. Thoms, late of the first ward of the city of New-York, in the county of New-York, aforesaid, otherwise called Johan W. Thoms, on the seventeenth day of December, in the year of our Lord one thousand eight hundred and fifty-two, with force and arms, at

PAR. — VOL. III.      33

the ward, city and county aforesaid, feloniously had in his custody and possession, and did receive from some person or persons to the jurors aforesaid unknown, a certain false, forged, altered and counterfeited negotiable promissory note for the payment of money, commonly called a bank-note, purporting to have been issued. by a certain corporation or company, called the Southport Bank, duly authorized for that purpose by the laws of the State of Connecticut, which said last mentioned false, forged, altered and counterfeited negotiable promissory note for the payment of money was theretofore altered from a valid note of the same bank, for the payment of and of the denomination of one dollar, and which altered note is as follows :

"5               State of Connecticut.              5
  " B.                                  No. 5389.
  " The Southport Bank will pay "FIV" E dollar to the Bearer, on demand.
  " Southport, Sept. 2, 1851.
                                   I. ALVORD, Pres't.
" F. D. PERRY, Cash."

with intention to utter and pass the same as true, and to permit, cause and procure the same to be so uttered and passed, with the intent to injure and defraud divers persons to the jurors aforesaid unknown, he the said John W. Thoms, then and there well knowing the said last mentioned false, forged, altered and counterfeited promissory note, for the payment of money, to be false, forged, altered and counterfeited as aforesaid, against the form of the statute in such case made and provided, and against the peace of the people of the State of New-York, and their dignity.

                         N. BOWDITCH BLUNT,
                              District Attorney.

The People *v.* Thoms.

The prisoner pleaded not guilty, and was tried in the Court of General Sessions of the Peace, in and for the city and county of New-York, on the 10th of March, 1853, before Welcome R. Beebe, City Judge, and two of the aldermen of said city, judges of said court, with a jury.

The District Attorney called *William Clark*, who testified: I am an exchange broker, corner of Duane and Chatham streets. The bank-bill now shown to me (the same described in the indictment) is a valid one dollar bill on the bank it purports to be of; and has been altered to a five, by pasting a figure " 5 " over the figure " 1," and putting the letters " Fiv " over the place left by cutting out the letters " On " in the body of the bill.

Upon his *cross-examination* the witness testified that he knew it to be a valid one dollar bill, from having received such, and seen the genuine plates. Did not know the names of the president or cashier of the Southport Bank, and had never seen either of them write.

*Thomas Barton* testified: I am a police officer of the eleventh ward; I arrested the defendant on the 17th of December, 1852, at his grocery store, on the corner of Goerck and Delancy streets; I did not tell him why I arrested him; I called him out of the store and conducted him thirty or forty yards from his store, and put him in charge of officer Sutton; I then went to his dwelling, next door to his grocery, and made a search there, but found nothing. His wife was there; I did not tell her he was in custody; I then proceeded to the station-house where the prisoner had been taken, having left officer Robb at his house; I searched the prisoner at the station-house, and found nothing upon him at that time; after that Mr. Robb came in with prisoner's wife; Thoms was not present; one did not know that the other was there; I then searched the prisoner again, and found one five dollar bill altered

from one (the same set out in the indictment), in his cap, on the outside, between the lapel and body of his cap.

The District Attorney then asked the witness what statements were made By the prisoner; upon which the counsel for the defendant claimed the right to examine the witness as to the circumstances under which such statements (if any) were made, which being accorded, the witness testified as follows:

The prisoner appeared to be very much frightened; he cried and threw his arms around my neck. He seemed very much terrified. I cannot tell that he understood what he said; he spoke partly in English and partly in German. I could not understand what he said in German.

In answer to the District Attorney, the witness continued: I made no promises, and used no threats. I said nothing to him on the subject before he cried. There was nothing in my manner to frighten him before he cried and threw his arms around my neck.

The District Attorney then proposed to give in evidence the statements or confessions of the prisoner, to which the counsel for the prisoner objected, upon the ground:

First. That confessions made while the accused was under the state of mind and terror described by witness were inadmissible; and Secondly. That as the statements were made partly in a language not understood by witness, they should be excluded; the rule being, that *all* the statements should be given in evidence, and what was said by prisoner in the German language might have qualified or explained that which he said in English.

The court ruled that the confession was admissible; to which ruling the counsel for the defendant excepted.

The witness then testified: I asked him where he had got the bill which I found in his cap; he said it was one he had fixed that day. I then asked him if he had any more; he said no. At that moment, officer Sutton handed me a roll of bills, which he stated he had picked up from the

The People *v.* Thoms.

station-house floor. I asked the prisoner if they were his; he said they were; that he had dropped them out of his sleeve. I then locked him up until the next morning.

The District Attorney then offered five notes, all of different banks, and of the denomination of five dollars, four of which were genuine. One had the figure five in the margin cut out. Three of them had the letters "Fiv" cut out of the body of the bill. One of them was admitted to be a genuine one, altered into a five.

The counsel for the defendant objected to their admissibility, upon the ground that they were different in character from the note set out in the indictment. Objection overruled, and exception taken.

The witness continued: He said he did not think he had passed over three in a week, perhaps not more than one. Next morning, going from station-house to the police office, the defendant said, "it was a great trouble for so little money."

The bills were then put in evidence.

*Alexander Robb* testified: I am police officer of eleventh ward; met defendant's wife in the street, coming from the house; she asked where her husband was; I told her she had better go to the station-house, but did not tell her he had been arrested.

*Mr. Barton* being recalled, the District Attorney offered to prove that he searched the wife of the prisoner at the station-house, and the result of the search.

To which the defendant's counsel objected, upon the ground that such search was made while the prisoner was not present, and he could not be held criminally responsible under this indictment for anything which might have been found in possession of his wife.

The court overruled the objection, to which ruling the defendant's counsel excepted. The witness continued: "I searched the defendant's wife, and found in her possession the handkerchief now produced, having a large number of

the ends of figures in the margin, cut from bank-bills, now shown. (The handkerchief and contents were produced, and exhibited to the jury.) The prisoner said she was his wife.

Being *cross-examined*, the witness testified : Mrs. Thoms took this stuff out of her pockets; the defendant was not present; she said she had picked it up from the floor in her house.

The prosecution here rested, and, after evidence had been introduced in behalf of the prisoners,

Judge Beebe charged, substantially, as follows : After briefly recapitulating the facts, he instructed the jury that the confessions of the prisoner, not having been obtained by promise or threats, were evidence properly submitted to their consideration; that the possession of the notes from which words and figures had been cut, and another altered note, as well as the figures and words cut from bank-notes found in the defendant's possession, was evidence from which the jury might infer that the prisoner had the note, upon which the indictment was founded, in his possession with an intent to pass it as true, for the purpose of fraud.

The counsel for the prisoner excepted to the charge, and requested the court to charge upon the following propositions :

First. That the indictment avers that the " Southport Bank " was duly authorized by the laws of the State of Connecticut; it is a material fact in the case, and must be proved.

Upon this point, the court charged : That it is a material fact, but it need not be proved by the introduction of the charter ; that proof of such bills being in circulation in the community was sufficient evidence that such an institution was in existence, and authorized by the laws of the State of Connecticut. To which the counsel for the defendant excepted.

The People *v.* Thoms.

Second. That the confessions of the accused, made under great fear and agitation, partly in a language not understood by the witness, are not admissible upon the trial of the accused.

The court refused so to charge, but charged: That the law, as established, is, that if a crime is voluntarily confessed, without promise or threats, the confession is admissible. To which refusal and charge the counsel for the defendant excepted.

Third. That admissions made to the officer who apprehended the defendant, and before he had been brought before the magistrate, and before the defendant had been fully apprised of his rights, are not admissible in evidence.

The court refused to charge upon this point otherwise than they had already charged. To which refusal the counsel for the accused excepted.

Fourth. That if even the prisoner had the bill in his possession, knowing it to have been altered, he cannot be found guilty, under this indictment, unless there is evidence satisfying the jury that he had been guilty of some overt act, showing conclusively that he intended to utter it as true and genuine.

The court refused to charge upon this point otherwise than they had already charged. To which refusal the counsel for the defendant excepted.

The jury found the prisoner guilty. The cause having been brought before the Supreme Court, on a writ of error issued in behalf of the prisoner, the judgment of the Sessions was reversed, but no reasons were assigned by the Supreme Court for such reversal. The case was then brought before the Court of Appeals, by the District Attorney, on a writ of error.

*A. Oakey Hall* (District Attorney) for the people.

I. The confessions were correctly admitted by the court, and the charge regarding them was proper. 1. A confes-

sion made in great agitation, but without threats or promises, was admitted. (*State* v. *Crank,* 2 *Bailey,* 66, *note to Rosc.,* 41.) (1.) *In Thornton's case* (*Joy on Conf.,* 13; 1 *Moody Cr. C. R.,* 27), wherein a constable interrogated " in a manner calculated to intimidate" (the words of Bayley, J., who tried the case), but held out no promise or threat, the confession was held admissible.

II. The second ground of objection to admission of the confessions is contrary to the evidence. 1. All the confessions were given. 2. The law in regard to giving an entire confession contemplates a specific shutting out of part of a confession. 3. That the prisoner spoke partly in German, and that the witness did not understand German, is his misfortune. Suppose part of a prisoner's statements are incoherent, or " gibberish:" will this part, because necessarily not understood and not given, invalidate confessions, when all that can be understood are given in evidence? (1.) " The rule does not exclude a confession, where only a part of what the defendant said has been overheard." (*State* v. *Covington,* 2 *Bailey,* 569; *note to Rosc.,* 55.)

III. The notes were admissible to show motive or *scienter,* as stated in judge's charge. 1. They were not different in character from the note averred in the indictment. (1.) The indictment was for having in possession a five dollar altered note. Every one of the admitted bills was of this character, to wit, a five, altered from something else. (2.) The first note (figure 5 cut out of margin) may have been the one from which came the numeral five that was employed in altering the bill averred in the indictment. It was fair argument, to this effect, to the jury. (3.) Notes 2, 3 and 4 showed how the note averred in the indictment was probably altered by cutting out " fiv" to paste over " on." (4.) The fifth note was admitted to be a genuine one altered into a five, as was the one alleged in the indictment. (*Rex* v. *Taverner, in note to Rex* v. *Smith,* 4 *Carr. and Payne,* 411; 19 *Eng. Com. L. R.,* 449, *Phil. ed.*) (5.) There is a

The People *v.* Thoms.

distinction to be taken between *scienter* upon passing, and upon possession with intent to pass. (*Rosc. Cr. Ev.*, 92, 93; *Arch.*, 127.)

IV. There was concert proven between husband and wife; and evidence of what was found upon the latter, on the search objected to, was binding upon the former. 1. She was proven to have just come from his house, inquiring for him. 2. Her acts, and indeed the acts of any stranger coming from his house, under the circumstances of the arrest, would be binding, however objectionable her declarations might have been. 3. If there was anything in this objection, the testimony for defence connected the property found upon the wife directly with the possession of the prisoner. 4. The bundle, as found in the prisoner's house, was evidence against him.

V. The exception to charge, as to proof of the existence of the bank, is untenable. (*People* v. *Davis*, 21 *Wend.*, 309; *People* v. *Peabody*, 25 *id.*, 472.)

VI. There exists no distinction regarding admissions made before or after judicial examination. The only qualification is when the party is being examined; nothing which he then says is admissible, except that reduced to writing; this is by statute. 1. This kind of admission (to wit, confessions not made before a magistrate) was recognized in *People* v. *Hennessy* (15 *Wend.*, 147.)

VII. Intent is a pure question for the jury. Unexplained possession of forged paper, &c., has always been legitimate matter from which to presume guilty intent.

*Jonas B. Phillips*, for the defendant in error.

I. The court erred in admitting the evidence of the prisoner's confession. First. Because it was proved that the prisoner was very much terrified; that the witness could not tell that he understood all that he said; and that he spoke

partly in English and partly in German, a language not understood by the witness by whom the prosecution sought to prove the confession; Secondly. The confession was not voluntary; and the court did not exercise that degree of caution which should always regulate the admission of verbal confessions. (1 *Greenl.*, § 214; *Arch.*, 109; *Whart. Am. Cr. L.*, 185.) ·The value of confessions depends upon the supposition that they are deliberate and voluntary. (*Id.*, §§ 215, 219.) It matters not whether the terror or fear which operates upon the mind of the accused is produced by direct threats, or by the suddenness of his arrest, the fear of punishment, the dread of exposure, or any other cause tending to deprive him in any degree of his reason or throw him off his guard.

II. The second ground of objection to the admissibility of the confession is in strict accordance with the evidence. The prisoner is a German; he spoke partly in his native language, which was not understood by the witness, and partly in English. No rule is better established than that the whole of what a prisoner said should be taken together. (1 *Greenl.*, § 218; *Joy on Conf.*; *Arch.*, 114, *a*; *Whart. Am. Cr. L.*, 188; *Rosc. Cr. Ev.*, 55.)

III. The court erred in admitting the evidence as to what was found on the person of the prisoner's wife, when she was searched at the station-house, the prisoner not being present at the time. There was no evidence of any concert of action between them, in reference to the charge contained in the indictment, to render him responsible for her act or declarations.

IV. There was no evidence of the existence of such a bank as the Southport Bank of Connecticut. The cases of *The People* v. *Davis* (21 *Wend.*, 309) *and Same* v. *Peabody* (25 *id.*, 472) do not sustain a contrary position. It was not contended on the trial that the fact should be established by the production of the charter; but it was averred, as .it is

now, that there was no evidence whatever of the existence of such an institution.

V. Admissions made to officers by prisoners, before they are taken before a magistrate, should be excluded. The duty of an officer is to take the prisoner before a magistrate for examination; the law makes this imperative. It is for the protection of the accused; and he is deprived of all its benefits, if, before being taken before the proper officer, whose duty it is to caution him and apprise him of his rights, an artful and ingenious police officer extorts from him admissions, or entraps him into making a confession, even if he uses neither threats nor promises. (2 R. S., 590, et seq., 2d ed.)

VI. Intent is undoubtedly a question for the jury; but that which is legal evidence, from which a jury have the right to infer a guilty intent, is a question for the court. The mere possession of a counterfeit or altered note is not sufficient; and the court erred in refusing to instruct the jury that the prisoner could not be found guilty under this indictment, unless there was evidence of some overt act showing such guilty intent.

DEAN, J. The prisoner was indicted in New-York for having in his possession an altered bill of the Bank of Southport, in Connecticut, with intent to pass the same. The alteration consisted in pasting a figure 5 over the figure 1 in the genuine bill, and the letters "Fiv" over the letters "On." I cannot see that there was any error in the charge of the judge, in reference to the possession of the bill by the prisoner with intent to pass it as genuine. It was a question of fact for them, nor can I entertain a doubt but what their verdict was fully warranted by the evidence. Indeed, any other verdict on the testimony would have been an outrage alike to common sense and criminal jurisprudence. Whether all the evidence was admissible, is another question, which I propose to consider. The Supreme Court

reversed the conviction, but upon what ground does not appear.

The first exception taken was to the admissibility of the confessions of the prisoner, made to a police officer at the time of arrest, and when the altered bill, on search, had been found secreted in his cap.

The principle upon which declarations of parties in a civil action or criminal prosecution, made against their interest or innocence, are admitted in evidence, is one so manifestly correct that no judicial system rejects them. The foundation of this species of evidence is the innate selfishness of man's nature. Hence, all declarations made when the declarant is induced to speak from threats of punishment or offers of impunity are rejected, because it is known, so great is this desire of self-preservation, that men to secure it will often tell what is not true, even against their own innocence, if it but contributes to their safety. Subject to this exception, an admission, by and against the interest of the party to be affected by it, is always to be regarded as evidence, and the weight to be given to it must depend upon the character of the admission and the manner in which it is preserved and given to the court or jury. If in writing, and consequently the whole can be used precisely as made, there can be no evidence entitled to more consideration. If verbal, then the weight to be attached to the particular declarations proved must depend upon a variety of circumstances, all of which should be regarded by the tribunal to which the evidence is addressed. The intelligence of the person making the admission, the intelligence of the witness who heard and narrates it, his integrity and freedom from prejudice (for it is manifest that the suppression of a word, intentional or not, often affects so seriourly the sentence as to reverse its entire meaning), the circumstances under which the admissions are made, the freedom from constraint of any kind; these and numerous other considerations, which will suggest them-

The People *v*. Thoms.

selves to the mind, affect the weight to be given to the evidence, but not its admissibility.

In the case at bar the prisoner appeared very much frightened; he spoke partly in English and partly in German; the witness could not understand the German, but the officer used no threats and made no promises. The prisoner's counsel claims that confessions made under these circumstances were inadmissible, in consequence of the prisoner's state of mind, and also because the officer could not understand the German. The fear was evidently produced by the arrest and discovery of the altered bills, and not by any threats of the officer. It has never been held that confessions thus made were not admissible; on the contrary, such confessions, before the party has had an opportunity to confer with any one, and while acting under the direct influence of the remorse which always follows detection, are likeliest to be true. If the witness had said that a part of the same admission was in German and a part in English, I think the evidence would have been inadmissible. But it appears the admissions were at the police office, after the prisoner had been searched and the bills found; it does not appear that any portion of the admissions were in German. The general rule being that confessions are admissible, the onus was upon the prisoner's counsel to show that the witness could not give the whole. The answers appear to be full and explicit to the questions put. At best, it was only to be used against the conclusiveness of the confessions, and not to their admissibility. Nor is there any force in the objection that they were made prior to the time that the prisoner was taken before the examining magistrate. (1 *Greenl.*, § 215.)

The next exception is to the admission in evidence of the fact that the prisoner's wife was searched and the result of the search. The wife was arrested at about the same time with the prisoner, but a few minutes intervening; she was arrested while coming from his dwelling-house and before she knew of the husband's arrest; I cannot see that there is

anything in this objection.   The house of the prisoner or his store might have been searched ; any person in the house and who had been associated with the husband might have been searched ; and if anything had been found upon the person or in the house, which was connected with the bills found upon the prisoner, it would have been evidence for the consideration of the· jury ; much more does this reasoning apply to the wife, who is cohabiting with the husband, and who is, in fact as .in law, *sub potestate viri*.   I think the conviction was right and that the judgment of the Supreme Court should be reversed.

DENIO, J.   The fact that the prisoner had the altered note in his possession was fully proved ; and the only question was as to his knowledge of its character, and his intention respecting it.   The prosecution affirmed that he possessed it with the intent to pass it as true.   If he was concerned in altering it from a lower denomination, and especially if he carried on to any extent the business of detaching the numerals from genuine bills and affixing them to the notes of a lower denomination, it would naturally be presumed that he had some object in doing so, and none which could be suggested would be so probable as that he intended to pass off the notes, thus raised to a higher apparent value, as genuine notes of the value which they were made to assume ; and this would go very far to show that he intended to pass the note which was found on him, which had been dealt with in the same way.   Very strong evidence to show him engaged in this unlawful practice was given, independently of· that which arose out of the search of the person of his wife ; but the prosecution was not content to rest the case upon that evidence, but persisted, against the previous objection, in showing that she had in her possession engraved figures, cut from genuine bills, suited to the commission of this species of forgery.   If this evidence was incompetent, the Supreme Court was right in reversing the judgment, whatever may

be thought of the strength of the case against the prisoner upon the other evidence.

There was no other evidence of any concert between the prisoner and his wife, or that they were mutually engaged in altering bank bills, or that either of them had any knowledge of the facts which were proved against the other. Where two persons sustaining the relation of husband and wife are each found doing acts indicating criminal designs of the same nature, there are strong reasons for conjecturing that they are conspiring together; but it is mere conjecture, and not evidence, even the lamest guide of the fact. Now, the possession by the wife of these fragments of notes was enough legally to fix upon her the suspicion of criminal intention; but the presumption would not attach to the husband, unless we shall first suspect that, from their domestic relation, one of them (and especially the female) would not engage in such an enterprise without the coöperation of the other. But such a suspicion, though natural enough, is quite too vague to be made the foundation of a criminal judgment. If this evidence should be held competent, I do not see but that the criminal conduct of the wife, in any matter which admitted of the participation of another, might always be given in evidence against the husband, upon the presumption of concurrence growing out of the conjugal relation. The evidence was clearly incompetent, and, without examining the other exceptions, we must hold that the judgment was erroneous, and that it was rightly reversed by the Supreme Court.

The jugdment of the Supreme Court should be affirmed.

A majority of the judges concurring in the opinion of Judge Denio, the judgment of the Supreme Court was affirmed.